# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **KIMBERLY BYARS, an individual appearing on behalf of herself and all others similarly situated,** | )<br>)<br>) |
| Plaintiff, | ) NO. 3:19-cv-00541 |
| v. | ) |
| **DART TRANSIT COMPANY, et al.** | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This putative class action arises out of an employment dispute concerning alleged unpaid wages. Pending before the Court is Defendants' Motion to Transfer Venue or, Alternatively, to Stay Proceedings and Compel Arbitration (Doc. No. 19) and Memorandum of Law in Support (Doc. No. 20). Plaintiff has responded in opposition (Doc. No. 27), Defendants have replied (Doc. No. 33), and Plaintiff has filed a sur-reply (Doc. No. 39). For the following reasons, Defendants' motion will be granted in part and denied in part.

I. FACTUAL BACKGROUND

In December 2016, Defendant Dart Transit Company ("Dart"), a Minnesota-based interstate trucking company, hired Plaintiff Kimberly Byars as a truck driver to transport trailers and freight for its shipping customers. (Doc. No. 20 at 1.) As part of her pre-employment on-boarding process in Texas, Plaintiff signed various employment related documents, including a Business Operating Agreement ("Dart BOA") that contained the following provision regarding its scope:

> **This Agreement and any properly adopted Addenda shall constitute the entire agreement and understanding between the parties and it shall be interpreted under the laws of the State of Minnesota**. If there are any changes, they must be

> in writing and signed by both parties unless otherwise mutually assented to by both parties to the extent allowed by law. To the extent any disputes arise under this Agreement or in its interpretation, or that are related in any way to this Agreement, including those sounding in tort, DART and CONTRACTOR both agree to submit such disputes to final and binding arbitration under the commercial rules of the Transportation ADR Council, Inc., of Lenexa, Kansas at a point agreed upon or Minneapolis/St. Paul, Minnesota. Notwithstanding anything to the contrary contained or referred to herein, the parties agree that no class arbitrations shall be conducted. . . . Both parties agree to be fully and finally bound by the arbitration award, and, where allowed by law, a judgment may be entered on the award in any court having jurisdiction thereof.

(Doc. No. 20-2 at 7 (emphasis in original).) Directly above Plaintiff's signature, the Dart BOA also provided that "**THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION (Paragraph 17) THAT MAY BE ENFORCED BY THE PARTIES**."[1] (Id. at 9 (bold and caps in original).)

Plaintiff signed various addenda to the Dart BOA that also included mandatory arbitration provisions. (See id. at 17, 20-21, 23-24.) One of those addenda, the "Advantage® Fuel Network and Advances Contract," included a provision stating that "[a]ny question about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced. This arbitration provision is governed by the Federal Arbitration Act (the 'FAA')." (Id. at 21.)

In or around June 2017, Plaintiff left Dart to provide similar trucking services for Defendant Mainstream Transportation, Inc. ("Mainstream"), a Minnesota-based affiliate company of Dart that provides transportation services at many of Dart's intermodal ramps. (See Doc. No. 1 ¶ 17; Doc. No. 27 at 10.) Plaintiff also signed a Business Operating Agreement with Mainstream

---

[1] The arbitration provision appears in paragraph 18, rather than paragraph 17. (Doc. No. 20-2 at 7.)

("Mainstream BOA"),[2] which contained the same arbitration provision as the Dart BOA and the same arbitration disclaimer above Plaintiff's signature. (Doc. No. 20-3 at 7, 10.) Plaintiff stopped working for Mainstream in or around August 2017.

Notwithstanding the arbitration provisions in the Dart and Mainstream BOAs (collectively, "BOAs"), Plaintiff filed suit in this Court against Dart and Mainstream (collectively "Defendants") for alleged violations of the Fair Labor Standards Act's ("FLSA") minimum wage provisions, 29 U.S.C. § 206(a), breach of contract, and unjust enrichment, and purports to seek relief "on behalf of herself and all other similarly situated individuals" under Federal Rule of Civil Procedure 23 and the FLSA's collective action provision, 29 U.S.C. § 216(b). Defendants now move to transfer venue to the District of Minnesota or, alternatively to stay proceedings and compel arbitration.

II.  DISCUSSION

When a trial court is presented concurrently with a motion to transfer venue and a motion to compel arbitration, it is more efficient to consider the motion to compel arbitration first. See Doe #1 v. Déjà Vu Consulting, Inc., No. 3:17-cv-00040, 2017 WL 3837730, at *8 (M.D. Tenn. Sept. 1, 2017) ("based on strong federal policy favoring arbitration, . . . a motion to compel arbitration must take precedence over virtually any other pending motion"). "[I]f the court compels arbitration, . . . [it] need not address the alternative motion to transfer venue." Educ. Mgmt. Servs., LLC. v. Ahrens, No. SA-14-CA-116-OLG, 2014 WL 12586407, at *6 (W.D. Tex. May 23, 2014) (citing Hinnant v. American Ingenuity, LLC, 554 F. Supp. 2d 576, 588 n. 10 (E.D. Pa. 2008)), report and recommendation adopted, 2004 WL 12586778 (W.D. Tex. June 6, 2014). Accordingly, the Court will first address Defendants' motion to stay proceedings and compel arbitration.

---

[2] Plaintiff claims she signed the Mainstream BOA in Memphis, Tennessee (Doc. No. 27 at 10), but the agreement indicates it was executed in Buford, Georgia (Doc. No. 20-3 at 10). This factual dispute is immaterial to the Court's analysis.

3

A. Motion to Compel Arbitration and Stay Proceedings

Defendants move to stay this action in favor of arbitration based on the BOAs. In response, Plaintiff does not dispute that she signed separate BOAs with Dart and Mainstream, both of which include arbitration provisions. She instead argues against the BOAs' enforceability generally, claiming that the Court cannot compel arbitration under any applicable law in this case, and even if it could, the arbitration provisions in the BOAs are invalid and unconscionable.

1. The Federal Arbitration Act Does Not Apply to the BOAs

Generally, "where a litigant establishes the existence of a valid agreement to arbitrate the dispute at issue," the Federal Arbitration Act ("FAA") requires "the district court [to] grant the litigant's motion to compel arbitration and stay or dismiss proceedings until the completion of arbitration." Amos v. Lincoln Property Co., No. 3:17-cv-37, 2017 WL 2628820, at *4 (M.D. Tenn. June 19, 2017) (citing Glazer v. Lehman Bros., Inc., 394 F.3d 444, 451 (6th Cir. 2005)); 9 U.S.C. §§ 3-4. Earlier this year, however, the Supreme Court held that section 1 of the FAA excludes from the Act's coverage contracts between an interstate trucking company and its driver, regardless of the driver's status as an employee or independent contractor. New Prime Inc. v. Oliveira, 139 S.Ct. 532, 543-44 (2019). Thus, New Prime makes clear that the Court has no authority under the FAA to compel arbitration in this case.

2. Choice of Law

In New Prime, "the Supreme Court left open the possibility that a truck driver working for an interstate trucking company suing under the FLSA who had signed an arbitration agreement *could still be compelled to arbitration*," just not under the FAA. See Merrill v. Pathway Leasing LLC, No. 16-cv-02242-KLM, 2019 WL 1915597, at *2 (D. Col. Apr. 29, 2019) (emphasis in original) (citing New Prime, 139 S.Ct. at 537). That is because "[s]ection 1 [of the FAA] does not . . . in any way address the enforceability of employment contracts exempt from the FAA. It

4

simply excludes these contracts from FAA coverage entirely." Valdes v. Swift Transp. Co., Inc., 292 F. Supp. 2d 524, 529 (S.D.N.Y. 2003) ("State arbitration law governs [arbitrability], however, if the FAA does not apply."); Palcko v. Airborne Express, Inc., 372 F.3d 588 (3d Cir. 2004) (enforcing FAA-exempt arbitration agreement under Washington state law). In other words, "the fact that the [FAA] doesn't apply only means that its enforcement mechanisms aren't available, not that the whole dispute can't be arbitrated by enforcing the contract through another vehicle (like state law)." Atwood v. Rent-A-Center East, Inc., No. 15-cv-1023-MJR-SCW, 2016 WL 2766656, at *3 (S.D. Ill May 13, 2016); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1472 (D.C. Cir. 1997) ("[W]e have little doubt that, even if an arbitration agreement is outside the FAA, the agreement still may be enforced. . . ."). "That's true even when the contract says that the [FAA] applies and mentions no other law—if the federal act doesn't apply, the agreement to arbitrate remains viable, and the only question becomes what state's law applies to the contract to arbitrate." Atwood at *3.

Plaintiff argues that the BOAs' arbitration provisions cannot be enforced under state law because the parties intended that the FAA was the *only* law that applied to those agreements. (Doc. No. 27 at 10-13.) Specifically, she contends that because the Advantage® Fuel Network and Advances Contract addenda to the Dart BOA states that the FAA applies to the arbitration provision in *that* addendum, the parties have no valid agreement to arbitrate under any other law. (Id.) The BOAs, however, explicitly state that the entire "Agreement and any properly adopted Addenda . . . shall be interpreted under the laws of the State of Minnesota," and "any disputes aris[ing] under this Agreement or in its interpretation, or that are related in any way to this Agreement" shall be submitted "to final and binding arbitration. . . ." (Doc. No. 20-2 at 7; Doc. No. 20-3 at 7.) The addenda to the Dart BOA, including the Advantage® Fuel Network and

5

Advances Contract, also state that they should be interpreted under the laws of the State of Minnesota. (See Doc. No. 20-2 at 17, 20-21, 24.) Contrary to Plaintiff's argument, this is not a situation like Rittmann v. Amazon.com where "the FAA is inapplicable and the contract clearly indicates that state law is also inapplicable." See 383 F. Supp. 3d 1196, 1203 (W.D. Wash. 2019) (because the "parties explicitly indicated that Washington law is not applicable to the Arbitration Provision" the court could not compel arbitration under Washington law). Thus, the inapplicability of the FAA does not nullify the parties' agreement to arbitrate.

Given this background, the Court must determine which state's law applies to the enforceability of the arbitration provisions in this case. "In federal question cases, a District Court entertaining pendent state claims should follow the choice of law rules of the forum state." Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132, 136 (6th Cir.1996). Because Tennessee is the forum state, the Court will apply Tennessee choice-of-law rules.

Tennessee's conflict of law doctrine applicable to contractual claims provides that "when the dispute involves questions concerning rights and obligations under a contract, the court applies the law of the state where the contract was made, *absent a contrary intent*." Ohio Cas. Ins. Co. v. Travelers Indem. Co., 493 S.W.2d 465, 467 (Tenn. 1973) (emphasis added). "If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met." Williams v. Smith, 465 S.W. 3d 150, 153 (Tenn. Ct. App. 2014). "For the intent to be honored, the choice-of-law provision must be executed in good faith; the chosen jurisdiction must bear a material relationship to the transaction; the basis of the choice must be reasonable; and finally, the parties choice must not subvert the policy of a state having a materially greater interest and whose law would otherwise govern." Invisible Fence, Inc. v. Fido's

Fences, Inc., 687 F. Supp. 2d 726, 742 (E.D. Tenn. 2009) (citing Messer Griesheim Indus. v. Cryotech of Kingsport, Inc., 131 S.W.3d 457, 475 (Tenn. Ct. App. 2003)).

The BOAs' choice-of-law clause is valid and enforceable under these criteria. The BOAs and accompanying addenda, including the Advantage® Fuel Network and Advances Contract, explicitly state that they "shall be interpreted under the laws of the State of Minnesota." (Doc. No. 20-2 at 7, 17, 20-21, 24; Doc. No. 20-3 at 7.) The Court does not find that these clear choice-of-law clauses were executed in bad faith. In addition, "[Minnesota] bears a material relationship to the transaction and the basis of the choice was reasonable, as [Defendants are] incorporated under [Minnesota] law and [their] principal place of business is in [Minnesota]. Invisible Fence, 687 F. Supp. 2d at 743. Moreover, it does not appear that the interests of Tennessee, Texas, Kansas, or any other state is materially greater, nor does it appear that any interests would be subverted by the application of Minnesota law in this case.[3]

Accordingly, the Court will apply Minnesota law. Under Minnesota law, "agreements to arbitrate entered into . . . on or after August 1, 2011" are governed by the Minnesota Uniform Arbitration Act ("MUAA"), Minn. Stat. §§ 572B.01-.31.[4] (Id. § 572B.03(a)(1).)

---

[3] The Court would likely apply Minnesota law even in the absence of a valid choice of law provision. In federal question cases where the FAA does not apply, and the arbitration agreement contains no choice of law provision, federal common law choice of law rules apply. See Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 794-95 (2d Cir. 1980). The federal common law choice of law rule dictates applying the law of the jurisdiction having the "greatest interest in the litigation." In re Koreag, Controle et Revision S.A., 961 F.2d 341, 350 (2d Cir. 1992). Because Minnesota appears to have the greatest interest in the litigation, the validity of the BOAs' choice-of-law provisions bears little impact on the Court's conclusion to apply Minnesota law.

[4] "In 2010, the [Minnesota] legislature repealed Minn. Stat. §§ 572.08-.30, effective August 1, 2012, and recodified the Uniform Arbitration Act at Minn. Stat. §§ 572B.01-.31." Seagate Tech. v. Western Digital Corp., 834 N.W. 2d 555, 559 n.3 (Minn. App. 2013).

### 3. Validity of Arbitration Agreement

When a party moves to compel arbitration, Minn. Stat. § 572B.06(b) requires a court to determine two gateway issues: (1) whether a valid agreement to arbitrate exists, and (2) whether the particular dispute falls within the scope of the arbitration agreement. See City of Rochester v. Kottschade, 896 N.W. 2d 541, 548 (Minn. 2017). Regarding the second gateway issue, the parties do not dispute that Plaintiff's claims would fall within the scope of the arbitration agreements, if found to be valid, and the Court will resolve "any doubts regarding the scope of arbitrable issues" in favor of arbitration. See Churchill Envtl. & Indus. Equity Partners, L.P. v. Ernst & Young, L.L.P., 643 N.W.2d 333, 336 (Minn. App. 2002). Thus, the Court must determine only whether a valid arbitration agreement exists (the first gateway issue).

In determining whether a valid agreement to arbitrate exists, "courts generally apply state law principles that govern contract formation, to ascertain the parties' intent." Churchill, 643 N.W.2d at 337 (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). "Minnesota follows the objective theory of contract formation, under which an outward manifestation of assent is determinative, rather than a party's subjective intent." TNT Props., Ltd. v. Tri-Star Developers LLC, 677 N.W. 2d 94, 102 (Minn. App. 2004); Am. Fed. of State, Cty. and Mun. Emps., Council No. 14 v. City of St. Paul, 533 N.W. 2d 623, 627 (Minn. App. 1995). Moreover, an arbitration agreement is presumptively "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of the contract." Minn. Stat. § 572B.06; see also Cmty. Partners Designs, Inc. v. City of Lonsdale, 697 N.W. 2d 629, 632 (Minn. App. 2005). This presumption is in harmony with the Minnesota Supreme Court's "dedication to a public policy strongly favoring arbitration." Schmidt v. Midwest Family Mut. Ins. Co., 426 N.W.2d 870, 873 (Minn. 1988); see also Walker v. Ryan's Family Steak Houses, Inc., 400 F.3d

370, 377 (6th Cir. 2005) ("The federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law.").

There is no dispute that Plaintiff signed contracts with both Defendants, and those contracts refer to arbitration. Indeed, even if the Court reviewed only the pages Plaintiff signed, it would be impossible to avoid the conclusion that she objectively agreed to arbitration. As the Court noted at the outset, directly above Plaintiff's signature is the following statement, bolded and in all capital letters: "**THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION (Paragraph 17) THAT MAY BE ENFORCED BY THE PARTIES**." (Doc. No. 20-2 at 9; Doc. No. 20-3 at 10.) This clause is unambiguous. Plaintiff acknowledged by her signature that she was subject to a binding arbitration provision, and this clause (distinct from the arbitration clause itself) suggests that disputes would be subject to arbitration. See Janiga v. Questar Capital Corp., 615 F.3d 735, 744 (7th Cir. 2010). The overall agreements are also supported by adequate consideration, as Plaintiff would receive payment for her services. See C & D Invs. v. Beaudoin, 364 N.W. 2d 850, 853 (Minn. App. 1985). Accordingly, the BOAs' arbitration provisions are presumed to be valid. Minn Stat. § 572B.06.

Notwithstanding this objective evidence of her assent to arbitration, Plaintiff contends that the arbitration agreements she signed are invalid and unenforceable because (1) the potential arbitrator pool and arbitration rules are biased in favor of Defendants; and (2) the arbitration agreements are unconscionable. The Court finds that these arguments are mainly aimed at the enforceability of the arbitration provisions, rather than the BOAs as a whole. Thus, the court, and not the arbitrator, must decide whether the parties have an enforceable agreement to arbitrate. See Davies v. Waterstone Capital Mgmt., L.P., 856 N.W. 2d 711, 717 (Minn. App. 2014) ("[A] challenge to the validity of the arbitration agreement . . . is an issue for the court to decide."). "In

evaluating whether the parties agreed to arbitrate the present dispute," the Court "should resolve any doubts concerning the scope of arbitrable issues in favor of arbitration, 'whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" Johnson v. Piper Jaffray, Inc., 530 N.W.2d 790, 795 (Minn.1995) (quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

a. Alleged Bias of Arbitration Procedures

Plaintiff argues that the arbitration provisions are unenforceable because they require disputes to be submitted to "final and binding arbitration under the commercial rules of the Transportation ADR Council, Inc" ("TAC"), which are biased in favor of Defendants. Although Plaintiff's bias argument is not a "contract-based defense to the enforceability of an arbitration agreement," a party may avoid the agreed-upon arbitration process when "the arbitrator-selection process itself is fundamentally unfair." Walker v. Ryan's Family Steak Houses, Inc., 400 F.3d 370, 385 (6th Cir. 2005).

Plaintiff argues that the TAC's arbitrator-selection process is unfairly biased in Defendants' favor because all potential TAC arbitrators are required to be members of the Transportation Lawyers Association ("TLA"), an independent bar organization whose members "must actively represent companies in the transportation industry" and cannot "affiliat[e] with a firm that represents plaintiffs against the transportation industry." (Doc. No. 27 at 2-3.) She further notes that some of Defendants' own lawyers are either current or former TLA members. (Id. at 4.) As a result, Plaintiff claims the entire TAC arbitrator pool lacks the minimum level of impartiality required for arbitration, and thus there is no valid agreement to arbitrate.

Plaintiff premises her argument on Walker v. Ryan's Family Steak Houses, Inc., 400 F.3d 370 (6th Cir. 2005). In Walker, the Sixth Circuit refused to enforce an arbitration agreement because, among other things, (1) the defendant's financial relationship with the arbitration firm

10

was fundamentally unfair, particularly because the defendant provided over 42% of the firm's income, (2) the defendant "effectively determined the three pools of arbitrators" from which the arbitration panel would be drawn, and (3) the pertinent arbitration rules did not require minimum educational or experience requirements, nor an "explicit requirement that [the arbitrators] be unbiased." (Id. at 385-87.)

Here, unlike the arbitration procedures in Walker, the TAC's arbitration rules[5] provide satisfactory protections against biased arbitrators. For example, the rules require that "[n]o person shall serve as an Arbitrator who has a *financial* or personal interest in the outcome of the arbitration or who has acquired prior detailed knowledge of the matter in dispute." (TAC Rule 4.2 (emphasis added).) Each potential TAC arbitrator is also required to "disclose to the parties any information that might cause the person's impartiality or independence to be questioned," and Plaintiff is then free to challenge the appointment of any arbitrator who exhibits undue bias. (TAC Rules 4.3.1, 4.4) "This is not a situation where an unwanted arbiter or mediator is forced on an unwilling party," particularly because "[b]oth parties have [the] opportunity to evaluate and screen potential arbiters. . . ." Gilbert v. Big Sandy Furniture, Inc., No. 2:07-cv-0087, 2007 WL 2668137, at *5 (S.D. Ohio Sept. 6, 2007), report and recommendation adopted, 2007 WL 2983089 (S.D. Ohio Oct. 10, 2007). Moreover, each arbitrator must "have been engaged in the practice of transportation law for a minimum of ten (10) years," and is required to "faithfully hear and examine the matter in controversy and make a just Award." (TAC Rule 2.4(B), Appendix A.)

Even assuming arguendo that *all* of the TAC arbitrators have a lengthy background in transportation employer defense work, "a party cannot avoid the arbitration process simply by

---

[5] Transportation Lawyers Association, *Arbitration Rules for the Transportation ADR Council*, (Oct. 13, 2017), https://www.translaw.org/Documents/ADR/Administrative%20Rules%20for%20Arbitration.pdf [hereinafter, "TAC Rules"].

alleging that the arbitration panel will be biased." Walker, 400 F.3d at 385. The Court "decline[s] to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 634 (1985). Accordingly, the Court does not find the TAC arbitrator-selection process to be so fundamentally unfair to warrant invalidating the parties' arbitration agreements.

Plaintiff also raises a host of challenges to the neutrality of the TAC Arbitration Rules, claiming they will make securing discovery from Defendants "virtually impossible," will inappropriately impose costs and arbitration fees on Plaintiff, will not result in a reasoned opinion, and will not afford Plaintiff a hearing. (Doc. No. 27 at 5-6.) With respect to Plaintiff's argument that it will be "virtually impossible" to obtain discovery, TAC Rule 5.1 provides that a claimant may demand discovery after sufficiently documenting a claim. See also Minn. Stat. § 572B.17 (c) ("An arbitrator may permit such discovery as the arbitrator decides is appropriate in the circumstances . . ."). "Although those procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991) (quoting Mitsubishi Motors, 473 U.S. at 628). Given Defendants' indication that they are willing to pay Plaintiff's share of arbitration fees and costs (Doc. No. 33 at 7), Plaintiff's arguments about inappropriate costs are similarly speculative and potentially moot. Further, Plaintiff admits that the arbitrator could issue a reasoned opinion if there was an agreement to do so, (Doc. No. 33 at 7), and there is no absolute rule "that arbitrators should write opinions in every case or even in most cases." See Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 204 (2d Cir. 1998).

The Court does, however, agree that the TAC arbitration rules may not entitle Plaintiff to a hearing. Specifically, TAC Rule 7.1 states that "[i]f the amount in controversy . . . is less than Twenty-five Thousand Dollars ($25,000.00), the dispute shall be heard on the submission of documents alone." If the Court interprets this rule to mean that no hearing could ever be provided in relatively small disputes like this one, the parties' future arbitration could hypothetically run afoul of Minnesota's requirement for arbitrators to conduct a hearing. Minn. Stat. § 572B.15; see also Volkmann v. Volkmann, 688 N.W. 2d 347, 348-49 (Minn. App. 2004). Nevertheless, the Court does not find sufficient bias inherent in TAC Rule 7.1 to invalidate the parties' otherwise enforceable arbitration agreements in this case. The Court will not substitute its interpretation for that of the TAC arbitrators, who are "comparatively more expert about the meaning of their own rule, [and] are comparatively better able to interpret and to apply it." See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 85 (2002).

b. Unconscionability

Plaintiff also presents numerous arguments about why the arbitration agreements are unconscionable. "A contract is unconscionable if it is 'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'" In re Estate of Hoffbeck, 415 N.W.2d 447, 449 (Minn. App. 1987) (quoting Hume v. United States, 132 U.S. 406, 415 (1889)). "If a court determines that a contract contains an unconscionable clause, it may refuse to enforce the contract, enforce it without the offending language, or limit application of the unconscionable clause 'to avoid any unconscionable result.'" Kauffman Stewart, Inc., 589 N.W. 2d 499, 502 (Minn. App. 1999) (quoting Restatement (Second) of Contracts § 208 (1981)). The Court will address each of Plaintiff's unconscionability arguments in turn.

First, Plaintiff argues that the arbitration agreements are unconscionable contracts of adhesion presented on a "take it or leave it basis." (Doc. No. 27 at 20.) By definition, a "contract

13

of adhesion is one 'drafted unilaterally by the business enterprise and forced upon an unwilling and often unknowing public for services that cannot readily be obtained elsewhere.'" Vierkant by Johnson v. AMCO Ins. Co., 543 N.W. 2d 117, 120 (Minn. App. 1996) (quoting Schlobohm v. Spa Petite, Inc., 326 N.W. 2d 920, 924 (Minn. 1982)). Accordingly, "[t]he two factors for determining whether a contract is one of adhesion are: (1) was the contract the result of the superior bargaining power of one of the parties? and (2) was the service involved a public necessity?" Osgood v. Medical, Inc., 415 N.W. 2d 896, 899 n. 1 (Minn. App. 1987) (citing Schlobohm, 326 N.W. 2d at 923).

The record before the Court fails to support a finding that the arbitration agreements are unenforceable contracts of adhesion. Plaintiff contends she was in desperate financial need of a job and feared not having enough money to return home from her on-boarding orientation, but "the degree of 'economic compulsion' that Plaintiff asserts is no different from that of any unemployed individual who is looking for a job and cannot possibly suffice to support the revocation of an otherwise legal and valid contract." Seme v. Gibbons, P.C., No. 19-857, 2019 WL 2615751, at *5 (E.D. Pa. June 26, 2019). Plaintiff voluntarily signed the agreements as a condition of employment, and "[m]ere inequality in bargaining power is an insufficient basis to invalidate an arbitration agreement." Ottman v. Fadden, 575 N.W. 2d 593, 597 (Minn. App. 1998) (citing Gilmer, 500 U.S. at 33). Most importantly, Plaintiff has neither shown that Defendants provide services of public necessity, nor that she was unable to obtain employment with another company providing similar services. Schlobohm, 326 N.W. 2d at 925 (no adhesion contract where "no showing that [a party's] services were necessary or that the services could not have been obtained elsewhere"). Thus, the arbitration provisions in this case were not contracts of adhesion.

Plaintiff next argues that the arbitration provisions are unconscionable because she "was not provided the rules of the arbitration process." (Doc. No. 27 at 21.) The Court does not find this argument persuasive. The TAC rules are readily available online, and Plaintiff has not demonstrated that she either asked for the rules or that Defendants denied her access to them. See Yufan Zhang v. UnitedHealth Group, 367 F. Supp. 3d 910, 917 (D. Minn. 2019). The "mere failure to provide Plaintiff a copy of the [TAC] Rules does not render the [arbitration] agreement[s]" unconscionable. (Id.)

Similar to her argument about why the TAC rules are unfairly biased, Plaintiff further argues that the arbitration agreements are unconscionable because she was not told how much she might have to pay in arbitrator's fees, and those potential costs would "deter" her from vindicating her rights in arbitration. (Doc. No. 27 at 21.) The Supreme Court has rejected this exact argument, albeit in the context of the FAA, reasoning that the "risk" Plaintiff "will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 90-92 (2000). Moreover, Plaintiff has not shown any likelihood that she would incur prohibitively expensive costs, and the Court will not invalidate the arbitration agreements on these grounds. (Id.)

The Court similarly rejects Plaintiff's other unconscionability arguments. Plaintiff argues that she does not remember signing the arbitration agreements, (Doc. No. 27 at 21), yet courts have consistently refused to invalidate contracts merely because of a plaintiff's inability to remember signing them. E.g., Castillo Flores v. Harbor Shipping and Trading Co., S.A., No. Civ. A. 01-0738, 2001 WL 740509, at *3 (E.D. La. June 29, 2001) (collecting cases). She further argues that the arbitration agreements were not conspicuous in the large amount of paperwork she received, (Doc. No. 27 at 21-22), yet the arbitration disclaimer was bolded and in all capital letters directly above

15

her signature. See Valdes v. Swift Transp. Co., Inc., 292 F. Supp. 2d 524, 529 (S.D.N.Y. 2003) ("allegations fail to support a finding of unconscionability . . . in light of the fact that the [arbitration] clause appears in a section directly above the signature line"). Plaintiff also claims she was not given any effective right to consult an attorney before signing the agreement, (Doc. No. 27 at 9), but admits to not having funds to hire an attorney either. (Id.) Plaintiff further contends she "did not knowingly and voluntarily waive her rights to litigate or have a trial by jury," (Doc. No. 27 at 21), but she signed directly below the arbitration disclaimer and the "loss of the right to jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate."[6] Aufderhar v. Data Dispatch, Inc., 452 N.W. 2d 648, 653 (Minn. 1990) (quoting Pierson v. Dean, Witter, Reynolds, Inc., 742 F.2d 334, 339 (7th Cir. 1984)); see also Cooper v. MRM Inv. Co., 367 F.3d 493, 506 (6th Cir. 2004) (noting decisions that have "flatly rejected the claim that an arbitration agreement must contain a provision expressly waiving the employee's right to a jury trial").

For the foregoing reasons, the Court is not persuaded by Plaintiff's unconscionability arguments and concludes that the parties entered into a valid and enforceable agreement to arbitrate.

### 4. Compelling Arbitration and Staying Proceedings

The parties' agreement to arbitrate in Minnesota is enforceable under the MUAA. Unlike the FAA, the MUAA provides that "[i]f a proceeding involving a claim referable to arbitration under an alleged agreement to arbitrate is pending in court, a motion under this section *must be filed in that court*." Minn. Stat. § 572B.07 (emphasis added); cf. Mgmt. Recruiters Int'l, Inc. v.

---

[6] The Court is aware of one Title VII case from this district declining to enforce an arbitration agreement because the plaintiff had not knowingly and voluntarily waived her right to a jury trial. Hudson v. BAH Shoney's Corp., 263 F. Supp. 3d 661, 671 (M.D. Tenn. Apr. 11, 2017). However, until the Sixth Circuit adopts the fact-specific holding in Hudson, the Court is more inclined to follow binding Sixth Circuit precedent and other federal decisions holding that an arbitration agreement need not contain an express jury trial waiver to be enforceable.

Bloor, 129 F.3d 851, 854 (6th Cir. 1997) (holding that a court cannot compel arbitration outside of its own district under the FAA without rendering meaningless "the clause of [9 U.S.C. § 4] mandating that the arbitration and the order to compel issue from the same district"). Not only were Defendants required to file their motion to compel arbitration in this Court, this is the *only* court in which they could have done so. Accordingly, the Court will grant Defendants' motion to the extent it seeks to compel arbitration under the MUAA.

"If the court orders arbitration," the MUAA provides that "the court shall on just terms stay any judicial proceeding that involves a claim subject to the arbitration." Minn. Stat. § 572B.07(f). "The mandatory nature of this directive ('shall') confirms that the Legislature did not contemplate that a district court would dismiss or enter judgment on, rather than stay, an underlying action when it orders parties to arbitrate." City of Rochester v. Kottschade, 896 N.W. 2d 541, 548-49 (Minn. 2017). Thus, the Court will also stay the underlying action pending the completion of arbitration.

The Court sees very little left for it to do in this case, at least until arbitration is completed. Accordingly, the Court will administratively close the case. If either party wishes to re-open it, that party may do so by way of a motion setting forth the status of the arbitration proceeding and explaining the ground for seeking administrative re-opening.

III. Motion to Transfer Venue

"When a matter is stayed pending arbitration, it is appropriate for the court to deny other pending motions, without prejudice." Telos Holdings, Inc. v. Cascade, GmbH, No. 3:09-0380, 2009 WL 3415157, at *7 (M.D. Tenn. Oct. 19, 2009). Thus, given the stay ordered herein, Defendants' motion to transfer venue is denied without prejudice to it being re-filed if the stay is lifted and the case is administratively re-opened.

IV.     Conclusion

For the foregoing reasons, Defendants' Motion to Transfer Venue or, Alternatively, to Stay Proceedings and Compel Arbitration (Doc. No. 19) will be GRANTED IN PART. Plaintiff will be ORDERED to submit to arbitration, and this case will be STAYED pending resolution of the arbitration. Defendants' motion to transfer venue will be DENIED WITHOUT PREJUDICE. The case will be ADMINISTRATIVELY CLOSED and may be reopened for cause on the motion of either party.

The Court will issue an appropriate Order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE